CARLOS E. MENDOZA, UNITED STATES DISTRICT JUDGE
THIS CAUSE is before the Court on Plaintiffs' Dispositive Motion for Summary *1255 Judgment (Doc. 163), Defendant Kevin Guice's Response (Doc. 168), and Plaintiffs' Reply (Doc. 175). As set forth below, the motion will be granted.
I. BACKGROUND
In November 2011, Kevin Guice created Loyal Financial & Credit Services, LLC ("Loyal"). (Loyal Articles of Organization, PX 47, at 22-23).[1] Through Loyal, Guice established a telemarketing company that sold debt-relief services. (See Compton Decl., PX 43, ¶ 16; Loyal Commercial Telephone Seller Business License Application, PX 43, at 22-27; Loyal's Call Scripts, PX 43, at 30-36). The first service sold by Loyal was a program that purportedly assisted individuals in obtaining lower interest rates on their existing credit card debt-the lower interest rate ("LI") program. (See PX 43 at 30, 33-36). Loyal's primary method of obtaining lower interest rates for customers involved getting the customers new credit cards with promotional zero percent interest rates and then directing the customers to transfer their existing credit card debt to the new cards. (Cline Aff., Doc. 168-7, at 1; see also id. at 2 (indicating that Loyal and its related companies obtained lower interest rate credit cards for over ten thousand customers) ). When this method was utilized, Loyal claimed that it would keep the customers' interest rates at zero percent by perpetually obtaining new zero percent cards and transferring balances when the previous introductory rate expired. (See id. at 2; Stickles Dep., Doc. 163-49, at 179:18-180:2). Additionally, Loyal would sometimes negotiate with the customers' credit card companies to have the account placed in "hardship" status-i.e., the account would be closed, and customers would be given a zero or near zero percent interest rate for a certain period of time within which they were required to pay off their balance. (Doc. 168-7 at 1; Andrews Dep., Doc. 163-52, at 23:5-19). Loyal charged fees ranging from $500 to $5000 for the LI program. (Doc. 163-49 at 280:22-24; see also Doc. 163-52 at 213:1-4).
In 2013, Loyal also began selling debt-elimination ("DE") services. (Doc. 163-52 at 23:23-24). These services were marketed to Loyal's LI clients who had a certain amount of credit card debt. (Brownell Dep., Doc. 163-50, at 58:3-12). Loyal's DE services involved the customers ceasing to make payments on their credit card debt, and once the customers had been in default for at least three months, Loyal's employees negotiating a settlement of the debt with the credit card companies. (Hampton Dep., Doc. 163-51, at 20:2-12, 58:25-59:19). Loyal's fees for its DE program ranged from $2000 to $26,000. (Doc. 163-50 at 59:6-7; see also Doc. 163-52 at 212:21-25)
In February 2014, Life Management Services of Orange County, LLC ("LMS") was established, (LMS Articles of Organization, PX 47, at 13), and began offering the same LI and DE programs as Loyal, (see LMS Commercial Telephone Seller Business License Application, PX 43, at 137-142; LMS Call Scripts, PX 43, at 146-153). Throughout this time period, eleven other companies were established as part of Loyal's and LMS's business operations[2] -IVD Recovery, LLC (IVD Recovery Articles of Organization, PX 47, at 47-48); KWP Services, LLC (KWP Services Articles of Organization, PX 47, at 51-52); KWP Services of Florida LLC (KWP Services of Florida Articles of Organization, *1256 PX 47, at 56-57); LPSofFla LLC, (LPSofFla Articles of Organization, PX 47, at 60-61); LPSofFlorida L.L.C., (LPSofFlorida Articles of Organization, PX 47, at 64-65); PW & F Consultants of Florida LLC, (PW & F Articles of Organization, PX 47, at 68-69); UAD Secure Services LLC, (UAD Articles of Organization, PX 47, at 71-72); UAD Secure Service of FL LLC, (UAD Secure Service of FL Articles of Organization, PX 47, at 75-76); URB Management, LLC, (URB Articles of Organization, PX 47, at 79-80); YCC Solutions LLC, (YCC Articles of Organization, PX 47, at 83-84); and YFP Solutions LLC, (YFP Articles of Organization, PX 47, at 87-88), (collectively the "Shell Defendants").
The Federal Trade Commission ("FTC") and the State of Florida began investigating Defendants for multiple violations of Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et. seq. , and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.1 et seq.[3] (See Tyndall Decl., PX 46, ¶¶ 1-2; Caplan Decl., PX 48, ¶¶ 5, 9; Kleier Decl., PX 44, ¶ 6). As a result, Plaintiffs filed this case, and on June 8, 2016, all of Defendants' business activities relating to Loyal, LMS, and the Shell Defendants ceased due to a Temporary Restraining Order (Doc. 36) issued by this Court. (See also generally Preliminary Injunctions, Doc. Nos. 75-81, 83, 89, 99).
The claims in this case have been settled as to all Defendants except Guice. Plaintiffs allege that Loyal, LMS, and the Shell Defendants were operating as a common enterprise, which was controlled by Guice. They further allege that this enterprise, at Guice's direction, engaged in deceptive business practices, made material misrepresentations and omissions when selling their services, and violated numerous provisions of the TSR, including those relating to the Do Not Call ("DNC") Registry. Plaintiffs have now moved for summary judgement as to all claims against Guice.
II. SUMMARY JUDGMENT STANDARD
"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc. , 131 F.3d 995, 999 (11th Cir. 1997).
"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.' " Sawyer v. Sw. Airlines Co. , 243 F.Supp.2d 1257, 1262 (D. Kan. 2003) (quoting Anderson , 477 U.S. at 251-52, 106 S.Ct. 2505 ); see also LaRoche v. Denny's, Inc. , 62 F.Supp.2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear ... that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").
*1257 III. ANALYSIS
A. Common Enterprise
As noted, Plaintiffs allege that Loyal, LMS, and the Shell Defendants were operating as a common enterprise. When a common enterprise exists, each corporation may be held liable for the others' violations. F.T.C. v. HES Merch. Servs. Co. , 6:12-cv-1618-Orl-22, 2014 WL 6863506, at *5-6 (M.D. Fla. Nov. 18, 2014), aff'd , 652 F. App'x 837 (11th Cir. 2016). "There is not one universal or mandatory [test] to determine whether a common enterprise exists; instead, 'the pattern and frame-work of the whole enterprise must be taken into consideration.' " Id. at *5 (quoting Del. Watch Co. v. F.T.C. , 332 F.2d 745, 746 (2d Cir. 1964) ). "[C]ourts consider a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, unified advertising, and evidence which reveals that no real distinction existed between the [c]orporate [d]efendants." F.T.C. v. Direct Benefits Grp., LLC , 6:11-cv-1186-Orl-28, 2013 WL 3771322, at *18-19 (M.D. Fla. July 18, 2013) (quotation omitted) (collecting cases).
First, Loyal and LMS were, for all intents and purposes, the same company. Indeed, the record evidence indicates that LMS was created to take over Loyal's operations because Loyal and Guice were subject to criminal investigations and civil liabilities. Loyal and Guice were facing charges by the Florida Department of Agriculture and Consumer Services ("FDACS"), (PX 43 at 5 ¶¶ 29-33; see also generally id. at 50-69), and therefore, FDACS denied the renewal of Loyal's Commercial Telephone Seller license, (see id. at 5-6 ¶¶ 35-36; Denial of Application, PX 43, at 101). Further, Guice and Loyal were facing civil liability due to a suit by a previous customer, (see generally Childress Compl., Doc. 163-3 (filed in December 2013); Childress Notice of Dismissal, Doc. 163-4 (acknowledging that the case was settled in March 2014); see also Second Guice Dep., Doc. 163-43, at 84:2-9, 86:18-87:9 (invoking his Fifth Amendment right against self-incrimination in response to questions regarding whether LMS was created as a sham, at Guice's direction, during the pendency of the Childress litigation).
Accordingly, Guice asked one of his employees, Wayne Norris, to set up LMS and find someone to temporarily stand in as LMS's Registered Agent until he got his "court case" "cleared up." (Norris Dep., Doc. 163-44, at 120:2-5, 225:19-228:18; see also Doc. 163-43 at 84:2-9). Norris arranged for his wife's friend, Adrien Brezinski, who did not otherwise have ties to Loyal or the telemarketing industry, to do so. (Doc. 163-44 at 36:19-21, 168:9-12, 227:11-228:18).[4] However, Norris testified that Guice was, in reality, the owner of both Loyal and LMS, (Doc. 163-44 at 133:23-134:4), and Guice invoked his Fifth Amendment right against self-incrimination when asked whether he owned an interest in LMS, (First Guice Dep., Doc. 163-42, at 9:15-18).[5]
In addition, LMS submitted to FDACS scripts and documents that were identical to Loyal's scripts and documents, (compare PX 43 at 30-36 with id. at 146-153), *1258 and a substantial portion of Loyal's employees simultaneously became LMS's employees.[6] (Id. at 8 ¶¶ 54-56). Those employees noticed no changes in the operation of the business, (see Doc. 163-50 at 56:1-18); and many of them did not even know there had been a change until they received their paychecks or their renewed telemarketing license, which listed their employer as LMS rather than Loyal. (See id. at 56:13-57:1; Doc. 163-49 at 81:4-8, 82:15-83:23). Loyal and LMS were clearly operating as a common enterprise.
With regard to the Shell Defendants, the record establishes that they, combined with Loyal and LMS, constituted the quintessential "maze of interrelated companies" that forms a common enterprise. First, each of the Shell Defendants was set up in much the same manner as LMS-Guice asked Norris or another employee, Harry Wahl, to find people to set up the Shell Defendants to be "merchant accounts" for Loyal or LMS-i.e., to invoice and charge customers for Loyal's and LMS's services. (Doc. 163-44 at 149:14-150:14, 154:13-19, 189:9-25, 229:10-18). The record supports this conclusion as to each of the Shell Defendants as follows: IVD Recovery, (Karen Wahl Dep., Doc. 163-46, at 67:17-68:3; Doc. 163-43 at 67:13-24); KWP Services, (Doc. 163-44 at 229:10-18; Doc. 163-46 at 6:21-24; PX 43 at 3, ¶ 19; Doc. 163-43 at 101:12-21); KWP Services of Florida, (Doc. 163-44 at 234:9-12); LPSofFla, (id. at 232:9-14); LPSofFlorida, (id. at 232:25-233:3); PW & F, (id. at 230:24-231:1); UAD Secure Services, (id. at 221:1-5, 222:17-25); UAD Secure Services of Florida, (id. at 219:20-24); URB Management, (id. at 219:20-24); YCC, (id. at 233:7-12); YFP, (id. at 234:1-8).
Once the Shell Defendants were established, they were used as fronts for Loyal and LMS. Customers interacted with Loyal and LMS employees, and to the extent services were provided, they were done so by Loyal and LMS employees, but customers were told that they were working with one of the Shell Defendants. (See Doc. 163-51 at 46:14-49:23, 50:16-51:13; Doc. 163-52 at 144:4-145:7; see also, e.g. , Bishop Decl., PX 4, ¶ 27 (indicating that Loyal and LMS employee Lea Brownell represented that she was employed by KWP); Henderson Decl., PX 21, ¶¶ 5, 32-36 (indicating that Loyal and LMS employee Samantha O'Donnell directed customers to make payments to KWP); Maxwell Decl., PX 28, ¶¶ 22-24 (indicating that Loyal and LMS employees Celina Young and Heather Kline were providing services under the auspices of UAD Counseling); PX 49 at 8:6-15 (stating to an undercover investigator that there were multiple "different names" that the company used) ). Most customers never knew that they were actually working with Loyal and LMS.[7] (See *1259 PX 48 ¶ 20 (listing multiple Loyal and LMS employees whose names were provided in consumer complaints against various Shell Defendants); see also generally Consumer Decls., PX 2-PX 10, PX 12-PX 28, PX 30-PX 31, PX 33-PX 38, PX 110-PX 112 (indicating that customers believed they were working with one of the Shell Defendants and not exhibiting any knowledge of Loyal or LMS).
Payments were sent to the Shell Defendants.[8] (See E. Adkins Decl., PX 2, ¶ 24; J. Adkins Decl., PX 3, ¶ 9; PX 4 ¶¶ 23-24; Blakely Decl., PX 5, ¶ 15; A. Brabson Decl., PX 6, ¶ 3; J. Brabson Decl., PX 7, ¶¶ 17-18; Burke Decl., PX 9, ¶ 4; B. Cherry Decl., PX 10, ¶¶ 22-25; Fowler Decl., PX 14, ¶ 3; Gannon Decl., PX 15, ¶ 18; Gascon Decl., PX 16, ¶¶ 15-17; Graham Decl., PX 18, ¶ 33; Healey Decl., PX 20, ¶ 29; PX 21 ¶¶ 30-35; James Decl., PX 22, ¶¶ 16-17; Kubeny Decl., PX 25, ¶¶ 26-29; Laxton Decl., PX 26, ¶¶ 17-20; Lohr Decl., PX 27, ¶ 10; Myre-Napieralski Decl., PX 30, ¶¶ 32-34; Pompati Decl., PX 31, ¶ 10; Schallon Decl., PX 33, ¶¶ 24-27; Thomas Decl., PX 36, ¶¶ 10-11; Wiley Decl., PX 38, ¶ 18; White Decl., PX 111, ¶ 17-19; Fraver Decl., PX 112, ¶ 17). The money was co-mingled with Loyal's and LMS's operations. Specifically, after payments were made to the Shell Defendants, the individuals who set up those Shell Defendants would take cash out of their bank accounts and give it to a manager at Loyal or LMS.[9] (See Jackowski Dep., Doc. 163-47, at 6:10-15, 9:6-16, 13:6-12, 14:2-15:11, 17:6-19:21; Doc. 163-44 at 235:17-236:4, 249:17-251:10, 254:11-21). That money was then used for various expenses, including Loyal's and LMS's payroll and rent. (See, e.g. , Doc. 163-47 at 30:6-21; PX 102 at 1-3 (checks written from KWP's bank account to pay LMS's rent); PX 103 at 1-3 (wire transfers from LPSofFla and KWP to LMS for payroll); PX 98 at 5, 7 (transfers from LPSofFlorida to LMS for payroll) ). Money was also freely transferred among the various corporate bank accounts. (See First George Decl., PX 45, ¶¶ 25-39 (detailing over $8.8 million in transfers between the Corporate Defendants); PX 113 (summary of bank accounts); see also, e.g. , LMS Bank Account Statement, PX 101, at 1 (showing electronic transfer from YCC to LMS); PX 94 at 1-2 (customer checks written to IVD and deposited into Loyal's bank account); PX 96 at 1 (customer check written to URB and deposited in Loyal's bank account); PX 99 at 1, 2 (showing that a $6,490 check and a $4,359 check made out to UAD Secure Services was deposited in LPSofFla's bank account); PX 98 at 3 (showing transfer from LPSofFlorida to KWP Services) ). And finally, there is evidence that approximately $8,593,352.60 was transferred directly from the Shell Defendants to Guice, personally. (Fourth George Decl., Doc. 163-33, ¶ 7).
There is additional evidence that Loyal, LMS, and the Shell Defendants were operating a common enterprise, including overlapping addresses,[10] (PX 47 ¶¶ 11-12 (Loyal and IVD), ¶¶ 18-19 (UAD Secure Services and UAD Secure Service of FL); PX 48 ¶ 29); IP addresses, (PX 48 ¶¶ 24-26); documents, (id. ¶¶ 21-23); and phone numbers, (id. ¶ 28).
In sum, there was no real distinction between Loyal, LMS, or the Shell Defendants. Thus, they were engaged in a common enterprise and can be held jointly and *1260 severally liable for the actions of each entity.
B. Individual Liability
As noted, all Defendants except Guice have settled with Plaintiffs. Therefore, the only issue currently before the Court is whether Guice can be held individually liable for the common enterprise's violations. Once corporate liability is established, Plaintiffs must show either (1) "that [Guice] participated directly in the practices or acts" or (2) "had authority to control them" and "had some knowledge of the practices." F.T.C. v. Gem Merch. Corp. , 87 F.3d 466, 470 (11th Cir. 1996) (quoting F.T.C. v. Amy Travel Serv., Inc. , 875 F.2d 564, 573 (7th Cir. 1989) ); see also KC Leisure, Inc. v. Haber , 972 So.2d 1069, 1074 (Fla. 5th DCA 2008) (describing the requirements for individual liability under the FTC Act and stating, "Similarly, ... in order to proceed against an individual using a FDUTPA violation theory an aggrieved party must allege that the individual was a direct participant in the improper dealings"). While there is evidence that Guice participated directly in some of the violations, others require an analysis of Guice's control and knowledge.
1. Control
"Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." Amy Travel Serv. , 875 F.2d at 573 ; F.T.C. v. RCA Credit Servs., LLC , 727 F.Supp.2d 1320, 1339 (M.D. Fla. 2010). Further, "[a]n individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." F.T.C. v. Transnet Wireless Corp. , 506 F.Supp.2d 1247, 1270 (S.D. Fla. 2007) (quoting F.T.C. v. Windward Mktg., Inc. , CIV. A. 1:96-CV-615F, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997) ).
With regard to Loyal, there is no question that Guice had the ability to control its practices. Indeed, Guice does not appear to dispute this fact. (Doc. 168 at 16 (arguing that there is an issue of fact as to whether Guice controlled any of the companies "other than Loyal" (emphasis added) ) ). First, the evidence establishes that Guice owned an interest in Loyal. In addition to Guice invoking his Fifth Amendment right against self-incrimination[11] when asked, "do you own any interest in [Loyal]?," (Doc. 163-42 at 9:24-10:2), Guice admitted to being the owner of Loyal during a 2013 investigation by FDACS, (Investigator's Field Report, PX 43, at 65-66 (identifying Guice as "owner" of Loyal in a document that Guice signed); Settlement Agreement with FDACS, PX 43, at 83 (containing Guice's signature on behalf of Loyal as its owner) ). Guice was also identified as the owner of Loyal by Norris, (Doc. 163-44 at 133:23-134:4), and Guice's Facebook page listed him as the owner of "LFCS"-an abbreviation of Loyal's full name, (PX 48 at 108). Additionally, Guice received approximately $1,732,332.60 in payments from Loyal. (Fourth George Decl., Doc. 163-33, ¶ 7).
The evidence also establishes that Guice's position was not simply a title; he *1261 exerted control over Loyal's operations. Guice applied for a Commercial Telephone Seller business license on behalf of Loyal, and the application listed Guice as Loyal's Registered Agent and Manager. (PX 43 ¶ 16; PX 43 at 22-23); see also PX 47 at 22-23 (listing Defendant as the registered agent and manager of Loyal) ). Guice was also the only individual listed on a Bank of America account on behalf of Loyal. (Bank of America Signature Card, Doc. PX 121, at 1). Finally, Guice invoked his Fifth Amendment right against self-incrimination in response to the following questions: "Did you ever develop any of [Loyal's] scripts?" and "Did you ever develop any of [Loyal's] new client packets?" (Doc. 163-42 at 117:21-118:3). Thus, there is no issue of fact with regard to Guice's ability to control Loyal's practices.
With regard to LMS, the record also demonstrates that Guice was able to exert control over it. First, as explained above, LMS was, for all intents and purposes, the same entity as Loyal, and the policies, scripts, and procedures that were put in place by Guice at Loyal were carried over to LMS. Moreover, the evidence establishes that Guice participated in the day-to-day oversight of LMS. Guice directly controlled the flow of LMS's income. (See Doc. 163-44 at 265:2-266:17; Doc. 163-47 at 14:12-14, 14:25-17:2; Doc. 163-52 at 102:14-20). He also set out requirements for hiring at least some employees. (Second Norris Dep., Doc. 163-45, at 12:15-13:4). And, Guice was involved in operational decisions such as making payments on behalf of customers, refunds, addressing complaints from regulatory agencies-often dealing with the types of allegations at issue here-and consulting regularly with many of LMS's managers and with Lea Brownell, the primary salesperson[12] for the DE program, (Doc. 163-50 at 57:14-20, 59:15-16). (Doc. 163-45 at 13:8-18; Doc. 163-51 at 84:10-15; Doc. 163-50 at 163:24-164:7; Doc. 163-52 at 10:15-20, 11:14-16, 99:24-100:17; see also Doc. 163-43 at 153:18-21 (invoking his Fifth Amendment right against self-incrimination in answer to the question of whether Guice "formulated, directed, controlled, had the authority to control or participate in the acts and practices of the common enterprise composed of [LMS, Loyal, and all of the Shell Defendants]") ).
Guice's reliance on the deposition testimony of various low-level LMS employees is insufficient to create an issue of fact. Guice asserts that employee Randi Stickles "did not consider ... Guice to be her boss" and that employees Jessica Hernandez and Lea Brownell believed that Harry Wahl owned LMS. (Doc. 168 at 18). First, the testimony cited by Guice relating to Stickles and Brownell is not on the record. (Doc. 168 at 18 nn.64-65 (citing page 58 of Stickles' deposition); Doc. 163-49 at ECF pp. 6-7 (skipping from deposition page 56 to deposition page 81); (Doc. 168 at 18 nn.66-67 (citing pages 62 and 71 of Brownell's deposition); (Doc. 163-50 at ECF pp. 5-6 (skipping from deposition page 60 to deposition page 81) ). Nevertheless, accepting Guice's representation of the deposition testimony as true, it is inconsequential.
Stickles was a low-level salesperson, who lacked any actual knowledge of the ownership of the companies. (See Doc. 163-49 at 92:10-14 (noting that Stickles was a "closer"-i.e., a salesperson-the entire time she worked for Loyal and LMS); id. at 82:20-84:9 (indicating that Stickles was not aware of the organization of the Defendant companies or who had ultimate authority over them) ). Brownell and Hernandez were similarly low-level employees-as noted, Brownell was the salesperson for the DE program; Hernandez was a salesperson *1262 for approximately six months, and thereafter she was a customer service representative, where she made new client packets, answered the phone, and scheduled appointments, (Hernandez Dep., Doc. 163-53, at 17:10-19). Neither had actual knowledge of who owned LMS. (See Doc. 163-50 at 163:2-164:3 (noting that Brownell "was told" that Harry Wahl was her boss but admitting that she "really [did not] know" and noting that she continued to speak with Guice on a weekly basis regarding the DE program); Doc. 163-53 at 34:6-24 (indicating that Hernandez believed that Harry Wahl was the owner because she "heard rumors that he ... took over [LMS]") ). Further, the dispositive issue is not whether Guice owned LMS, but instead, whether he controlled LMS. The record evidence discussed above establishes that he did.[13] None of the testimony cited by Guice undermines or contradicts the above-cited evidence that Guice did, in fact, assert control over LMS.
Finally, there is also no issue of fact as to Guice's control over the Shell Defendants. As explained above, they were set up and operated at Guice's direction. Guice controlled the flow of money between the Shell Defendants, LMS, and Loyal; he decided how much money would be withdrawn from those companies and where that money would go. And, as also noted above, collectively, the Shell Defendants paid Guice over 8.5 million dollars. Accordingly, it is clear that Guice had the ability to control the acts and practices of the Shell Companies.
2. Knowledge
"The FTC may establish the knowledge requirement by showing that individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.' " Transnet Wireless Corp. , 506 F.Supp.2d at 1270 (quoting Amy Travel Serv. , 875 F.2d at 574 ). "The FTC does not need to demonstrate, however, that the individual defendant had the intent to defraud." Id. ; see also Amy Travel Serv. , 875 F.2d at 574 ("We find that imposing a requirement that the FTC prove subjective intent to defraud on the part of the defendants would be inconsistent with the policies behind the FTCA and place too great a burden on the FTC."). Whether Guice had knowledge of the common enterprise's violations will be discussed below as to each violation.
C. Violations
Plaintiffs allege that Defendants engaged in a myriad of violations of Section 5 of the FTC Act, FDUTPA, and the TSR. Each violation, and whether Guice can be held liable for those violations, will be discussed in turn.
1. DNC Registry
Plaintiffs assert that Loyal and LMS violated the TSR by making automated calls to numbers on the DNC Registry and by failing to pay the annual feel to access the DNC Registry. The TSR makes it illegal to initiate "any outbound telephone call to a person when ... [t]hat person's telephone number is on the [DNC] registry ... unless the seller or telemarketer: (1) [c]an demonstrate that the seller has obtained the express agreement, in writing, of such person to place calls to that person ...; or (2) [c]an demonstrate that the seller has an established business relationship with such person ...." 16 C.F.R. § 310.4(b)(1)(iii)(B). It is also illegal to initiate "any outbound telephone call that *1263 delivers a prerecorded message ... to induce the purchase of any good or service" unless the message is covered by the safe harbor provision or the seller obtained "an express agreement, in writing" to do so. Id. § 310.4(b)(1)(v)(A). Finally, it is illegal "for any seller to initiate, or cause any telemarketer to initiate," or for "for any telemarketer, on behalf of any seller, to initiate" an "outbound telephone call to any person whose telephone number is within a given area code unless [the] seller, either directly or through another person, first has paid the annual fee ... for access to the telephone numbers within that area code that are included in the National [DNC] Registry ...." Id. § 310.8(a), (b).
It is undisputed that Loyal and LMS violated these rules. Loyal and LMS used an outside dialer or lead generator to make outbound calls to induce individuals to purchase Loyal's and LMS's services. (Kunz Dep., Doc. 163-48, at 14:5-23; Doc. 163-49 at 54:5-8, 55:12-18). When an individual answered those calls, a pre-recorded message was played, which permitted the recipient of the call to press a number to speak with a live operator. (Doc. 163-49 at 54:9-55:1; Anderson Decl., PX 1, ¶¶ 4-5, 8; PX 4 ¶¶ 5-7; PX 7 ¶ 5; C. Cherry Decl., PX 11, ¶¶ 4-5; Coombs Decl., PX 12, ¶¶ 5-6; PX 15 ¶¶ 3-4; PX 16 ¶¶ 5-6; Jorolemon Decl., PX 23, ¶¶ 3-4; Mussallem Decl., PX 29, ¶¶ 6, 8; Railey Decl., PX 32, ¶¶ 4-5; PX 33 ¶¶ 5-7; Schley Decl., PX 34, ¶¶ 3-4; Scholzen Decl., PX 35, ¶¶ 5-6; PX 36 ¶ 3; Wedemeyer Decl., PX 37, ¶¶ 5-7; PX 111 ¶ 5; Franklin Decl., PX 155, ¶ 4; see also PX 46 ¶¶ 13-15, 25-27 (describing an FTC undercover investigator intercepting two of these automated calls). Further, individuals on the DNC Registry who had no prior business relationship with any of the Defendants and who had not given any Defendant written permission to contact them were contacted by Loyal and LMS in this manner. (PX 1 ¶ 11; PX 2 ¶ 3; PX 4 ¶ 3; PX 7 ¶ 3; Brown Decl., PX 8, ¶ 3; PX 10 ¶ 4; PX 12 ¶ 3; PX 15 ¶ 2; PX 16 ¶ 3; PX 18 ¶ 2; PX 20 ¶ 3; PX 21 ¶ 3; PX 22 ¶ 3; PX 23 ¶ 2; Knauss Decl., PX 24, ¶ 3; PX 25 ¶ 4; PX 27 ¶ 2; PX 28 ¶ 3; PX 29 ¶ 4; PX 30 ¶ 2; PX 32 ¶ 10; PX 33 ¶ 3; PX 35 ¶ 3; PX 37 ¶ 3; PX 38 ¶ 3; PX 111 ¶ 3; see also PX 46 ¶¶ 40, 41 (noting that the FTC received approximately 6,536 DNC complaints regarding phone number (248) 215-0437, at least 5,879 of which reported the use of a pre-recorded message, and approximately 1,956 DNC complaints regarding phone number (361) 271-4848, approximately 1,679 of which reported the use of a pre-recorded message); id. ¶¶ 4-6, 10, 23-24 (establishing that phone number (361) 271-4848 was associated with the Defendant companies); id. ¶¶ 25-36 (establishing that phone number (248) 215-0437 was associated with the Defendant companies) ). Finally, none of the entities involved in the common enterprise, nor anyone on their behalf, paid the annual fee to access the DNC Registry for any area codes. (Id. ¶¶ 55-57).
Plaintiffs have established that Guice is liable for these violations. Indeed, it appears that Guice was directly involved in the violations. Guice set up Loyal and its operating procedures, which included the use of automated calls and which were continued throughout LMS's existence. Guice also personally dealt with customer complaints, (see 163-45 at 13:5-18; see also generally Doc. Nos. 163-7-163-16 (exhibiting Guice's involvement via e-mail in customer issues) ), and as referenced above, there are numerous individuals that complained about being contacted by the Defendant companies despite being on the DNC Registry. Thus, Plaintiffs have established liability as to Guice with regard to Counts Eight, Nine, and Ten, and they are entitled to summary judgement as to those counts.
*1264 2. Misrepresentations and Omissions
Next Plaintiffs allege Defendants committed, and Guice is liable for, many misrepresentations and omissions regarding the programs sold by Loyal and LMS, which violate Section 5, FDUTPA, and the TSR. Both Section 5 and FDUTPA prohibit "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1) ; Fla. Stat. § 501.204(1), and they are construed in the same manner. Fla. Stat. § 501.204(2) ("It is the intent of the Legislature that, in construing [FDUTPA's prohibition against unfair and deceptive practices], due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating [to Section 5]."); KC Leisure, Inc. v. Haber , 972 So.2d 1069, 1072-73 (Fla. 5th DCA 2008) (noting that "[i]nstead of defining specific elements for an action under the statute," FDUTPA directs courts to rely on interpretations of Section 5). Additionally, misrepresentations and omissions that violate the TSR constitute unfair or deceptive acts or practices in violation of Section 5 and the FDUTPA. F.T.C. v. Lalonde , 545 F. App'x 825, 840 (11th Cir. 2013) (citing 15 U.S.C. §§ 57a(d)(3), 6102(c) ).
a. Misrepresentations Regarding Affiliations
Plaintiffs seek to hold Guice liable for Loyal's and LMS's employees' false statements claiming to be affiliated with various institutions in violation of the TSR. Specifically, the TSR provides that it is illegal to "[m]isrepresent[ ], directly or by implication, in the sale of goods or services ... [a] seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity." 16 C.F.R. § 310.3(a)(2)(vii). It is undisputed that employees of Loyal and LMS violated this provision when selling the LI program by misrepresenting, both directly and by implication, that they were representatives of or otherwise affiliated with customers' banks, credit card issuers, and credit card associations such as MasterCard and Visa. (Demarco Decl., PX 13, ¶ 5; PX 26 ¶ 8; PX 46 ¶¶ 16, 29, 31; Tr. of Nov. 12, 2015 telephone call, PX 51, at 8-9; Tr. of Nov. 19, 2015 telephone call, PX 52, at 7-8, 9; see also Doc. 163-49 at 184:2-21 (stating that sales people often told customers that the company was a licensed enrollment center with Visa, MasterCard, American Express, and Discover); Call Scripts, Doc. 41-2, at 7, 9-10, 12-13 (providing that a salesperson should state "we work directly with the corporate office of Visa, MasterCard, American Express and Discover, which are the merchants of the 551 nationwide lenders[,] [l]ike Chase, Bank of America, Capital [One], etc." and, in response to the question "Why did you call me?" they should state, "Actually the corporate offices of Visa, MasterCard, American Express and Discover ... sent out the automated message so when you pressed 1 you were transferred over to the first representative in the qualifications department available to speak with you") ). However, Defendants had no affiliation with these entities. (Brady Decl., PX 40, ¶¶ 4-5; Elliot Decl., PX 41, ¶¶ 7-11; Kilmer Decl., PX 39, ¶¶ 27-32; Doc. 163-52 at 88:3-6, 93:20-21, 136:18-23).
Guice argues that these misrepresentations were neutralized by a boilerplate "disclosure" script read to customers after they already agreed to participate in the LI program, which states that the company is "not a lending institution" and is "not [giving the customer] a credit card offer." (Grinnan Decl., PX 19, at 46). Such statements are inadequate to counteract the false and misleading statements regarding affiliations. Representations are deceptive when, "based on a common sense net impression of the representations as a whole, the representations are likely to *1265 mislead reasonable customers to their detriment." F.T.C. v. Tashman , 318 F.3d 1273, 1283 (11th Cir. 2003) (dissenting opinion) (collecting cases). First, the language cited by Guice does not mitigate the false statements made by employees-i.e., that the Loyal and LMS were affiliated with the above-referenced institutions-the company could certainly have been affiliated with a lending institution without being a lending institution or making a credit card offer themselves. Moreover, such a vague, technical disclosure read after customers have committed to purchasing a product is not sufficient to undermine the net impression that the company was affiliated with these institutions.
Additionally, in many cases, Loyal's and LMS's employees falsely stated that they worked for certain non-existent entities, the names of which sounded consumer-friendly or like they were affiliated with banks and credit card issuers, such as "American Credit Assistance," "Bank Card Services," "Credit Assistance Program," "Credit Card Services," and "Credit Management Associates." (PX 46 ¶¶ 15, 29; PX 51 at 8:22-25; PX 52 at 7:18-20; PX 5 ¶ 2; PX 11 ¶¶ 10-11; Goldsmith Decl., PX 17, ¶ 3; PX 19 ¶ 9; PX 20 ¶ 5; PX 21 ¶ 7; PX 22 ¶ 2; PX 33 ¶ 6; PX 34 ¶ 8; see also Second Caplan Decl., Doc. 41-2, ¶ 9 (describing call scripts found at Defendants' office with American Credit Assistance, Credit Assistance Program, and Bank Card Services listed); id. at 7, 10, 13 (call scripts directing salespeople to state the name of the company was American Credit Assistance, Credit Assistance Program, or Bank Card Services) ).
The uncontradicted evidence establishes that Loyal's and LMS's managers knew that their employees were making such misrepresentations. (Doc. 163-49 at 184:2-12; id. at 171:21-173:4, 182:21-183:13). Loyal and LMS are liable for these misrepresentations regardless of any unsuccessful attempts to stop such misrepresentations. FTC v. Partners In Health Care Ass'n , 189 F.Supp.3d 1356, 1365-66 (S.D. Fla. 2016) (collecting cases). Further, there is evidence that Guice had actual knowledge of some of these misrepresentations. (See Doc. 163-15 (forwarding an investigative demand from the State of North Carolina to Guice's e-mail address where the demand and consumer complaint are directed to "Bank Card Services"); Doc. 163-43 at 58:7-59:9, 91:23-92:4, 92:17-93:12 (pleading the Fifth to the questions of whether Loyal's and LMS's employees told customers that they worked for entities other than Loyal or LMS, including American Credit Assistance, Bank Card Services, and Credit Management Assistance, and whether those employees told customers that they were representatives of or affiliated with the customers' banks, credit card issuers, or credit card associations, such as MasterCard and Visa) ). Thus, at a minimum, Guice had an awareness of a high probability that such misrepresentations were being made, and if he did not have actual knowledge of the misrepresentations it was because he intentionally avoided the truth. Therefore, Guice can be held personally liable for these violations, and Plaintiffs are entitled to summary judgment as to Count Four and, insofar as they are based on false affiliation misrepresentations, Counts One and Eleven.
b. Omissions Regarding Cost of LI Services
Plaintiffs next assert that Guice is liable for the common enterprise's failure to fully apprise customers of the total cost of the LI program. The TSR requires sellers and telemarketers, prior to a customer consenting to pay, "to disclose truthfully, in a clear and conspicuous manner ... [t]he total costs to purchase, receive, or use, ... any goods or services that are the *1266 subject of the sales offer." 16 C.F.R. § 310.3(a)(1)(i).
The LI program was typically fulfilled by obtaining new credit cards for the customer with introductory zero percent interest rates and then transferring the customer's existing credit card debt to the new card or cards. These balance transfers typically carry a balance transfer fee-during this time frame, the most common fee was three percent of the amount transferred. (Wilhelm Decl., PX 42, ¶ 36). It is undisputed that employees did not inform customers of these balance transfer fees. (Doc. 163-49 at 181:6-23; PX 7 ¶ 12; PX 8 ¶ 14; PX 10 ¶ 15; PX 13 ¶ 13; PX 16 ¶ 13; PX 17 ¶ 15; see also Doc. 163-43 at 62:19-63:22 (pleading the Fifth with regard to whether Defendants' employees advised customers of fees including balance transfer fees) ). Further, in their sales pitches, Loyal's and LMS's employees emphasized that there was only a "one time" service fee, which could be reasonably interpreted by customers to mean that there would be no fees other than that charged by Defendants. (See PX 19 ¶ 63; see also PX 5 ¶ 20; PX 8 at 5; PX 12 at 6; PX 13 at 5).
According to Heather Cline, one of the managers and Guice's sister, Loyal and LMS relied on the credit card issuer to inform the customer of any transfer fees. (Doc. 168-7 at 1). However, obtaining new, lower interest rate credit cards and transferring balances was an essential part of the LI program-that is, in most cases balance transfer fees were necessary to the fulfillment of the program-and those fees were borne by the customer. Thus, the fees were part of the cost of the LI program, and Defendants had a duty under the TSR to disclose them.
Further, Loyal's and LMS's employees did not begin the process of speaking with the banks about obtaining a new card until customers had already agreed to purchase the LI program. (See, e.g. , PX 5 ¶¶ 12-13; PX 7 ¶¶ 11-15; PX 8 ¶¶ 12-15; PX 10 ¶¶ 13-16, 18; PX 12 ¶¶ 19, 23-24; PX 13 ¶¶ 13, 15). Therefore, even if the credit card issuer's representatives did properly inform the customers about the balance transfer fees, it was too late. Loyal and LMS had already obtained the customers consent to pay for the LI services.[14] Accordingly, Loyal and LMS violated the TSR by failing to fully and clearly disclose the cost of Defendants' rate reduction program. F.T.C. v. Publishers Bus. Servs., Inc. , 821 F.Supp.2d 1205, 1224 (D. Nev. 2010) (noting that "[t]he TSR prohibits a telemarketer to misrepresent, directly or by implication , the total cost of the goods" and determining that, while the defendant made technically accurate representations about its weekly fees, the representations were shrouded in other misleading statements and conduct, and therefore, they violated the TSR (emphasis added) ); In re Nat'l Credit Mgmt. Grp. , 21 F.Supp.2d 424, 456 (D.N.J. 1998) (determining that the defendant violated the TSR where "many consumers were led to believe the $95.00 [up-front fee] was the only cost associated with the services offered by [the defendant]" but there were additional fees disclosed after the consumers signed up for the defendant's services).
*1267 At least one of the managers had actual knowledge that the balance transfer fees were not disclosed at the appropriate time. (See Doc. 168-7 at 1 (indicating that the balance transfer fees were conveyed by the credit card companies after customers began the LI program) ), and none of the scripts disclosed the balance transfer fees. Given that Guice was involved in the creation of the scripts and he interacted regularly with Loyal's and LMS's managers, there is sufficient evidence, when taken in conjunction with Guice's invocation of his Fifth Amendment right against self-incrimination, (Doc. 163-43 at 63:3-6, 96:25-97:8), to hold Guice liable for these violations. Accordingly, Plaintiffs are entitled to summary judgment as to Count Two and Count Five.
c. Misrepresentations Regarding Amount of Money and Timeframe for Payoff
Next Plaintiffs assert that LMS's and Loyal's employees made material misrepresentations regarding the amount of money customers would save and how long it would take the customers to pay off their debts. The TSR prohibits "[m]isrepresenting, directly or by implication, in the sale of goods or services ... [a]ny material aspect of any debt relief service." 16 C.F.R. § 310.3(a)(2)(x). Material aspects of debt relief services include "the amount of money or the percentage of the debt amount that a customer may save by using such service" and "the amount of time necessary to achieve the represented results." Id.
Plaintiffs assert that Loyal and LMS employees violated this provision when they falsely told customers that utilizing the LI program would save them thousands of dollars[15] and would enable them to pay off their credit card debt three to five times faster. Unquestionably, these representations constitute statements regarding material aspects of the debt relief services. Nevertheless, Defendant asserts that Loyal and LMS fulfilled these promises, and therefore, they were not misrepresentations. The evidence indicates otherwise.[16] The employees' statements could not have been truthful at the time they were made because they had insufficient information to know whether they could, in fact, do what was being promised.
According to the unrebutted expert testimony of Lisa Wilhelm, "it is impossible to calculate on an individual basis the amount of interest that a particular consumer will save on his or her credit card debt, or how long it will take to pay off the debt[,] without first taking into account at least four critical pieces of information." (PX 42 *1268 ¶ 47). Specifically, one must know "1) the debt balance on the credit card, 2) the interest rate the customer currently pays on the credit card debt balance, 3) the new, reduced interest rate he or she expects to pay, and 4) the monthly payment amount." (Id.). The evidence indicates that at the time these representations were made, Loyal and LMS employees only had the first and second pieces of the puzzle-the debt balance on the credit card and the current interest rate. (PX 2 ¶¶ 9-12; PX 4 ¶¶ 14-17; PX 5 ¶¶ 6, 9; PX 7 ¶¶ 8-10, 13; PX 8 ¶¶ 7-8; PX 10 ¶¶ 10-11; PX 12 ¶¶ 12, 15-21; PX 13 ¶¶ 7-9, 14; PX 16 ¶¶ 9-11; PX 18 ¶¶ 10-11, 25; PX 19 ¶¶ 11, 16-17; PX 20 ¶¶ 6-9; PX 22 ¶¶ 7-8; PX 23 ¶¶ 9-13; PX 24 ¶¶ 8-10, 26; PX 25 ¶¶ 6-13; PX 26 ¶¶ 6-7, 10, 12; PX 28 ¶¶ 5-6; PX 33 ¶¶ 12-16; PX 34 ¶¶ 13-18; PX 35 ¶¶ 10, 14, 16; PX 37 ¶¶ 9-10, 12-15; PX 38 ¶¶ 8, 13; PX 111 ¶¶ 10-12; PX 112 ¶¶ 4-6). Indeed, at the time, Loyal and LMS employees did not even know if the customers could obtain lower or zero-percent interest rate cards, much less what the hoped-for lower rate would be. (See PX 42 ¶ 46 (explaining that Loyal and LMS employees would have to obtain specific information regarding the individual consumer's economic, financial, credit, and personal circumstances to know whether they would qualify for a lower interest rate), ¶¶ 21-28, (discussing the numerous factors Issuers take into consideration when approving-or not approving-a consumer for a lower interest rate or a zero-percent promotional interest rate), ¶ 87 (discussing the very limited circumstances where the LI program's plan of obtaining subsequent zero-percent promotional cards could, theoretically, work but noting that very few individuals fall into this category and explaining that a large amount of individualized information would be necessary to determine whether a consumer fits into the category) ). Thus, the representations regarding how much money customers would save and how much faster they would pay off their debt were, at best, misleading.
Guice is liable for these misrepresentations because he had actual knowledge of them. Specifically, these statements were in Loyal's and LMS's scripts, (PX 43 ¶ 21), which as discussed above, Guice was involved in writing and submitting. (See also Doc. 163-43 at 61:11-23, 95:9-96:2 (pleading the Fifth as to knowledge of these misrepresentations) ). Accordingly, to the extent they address these misrepresentations, Plaintiffs are entitled to summary judgment on Counts One, Three, and Eleven.
d. Misrepresentations Regarding Permanent, Significantly Lower Interest Rate
Plaintiffs also argue that that Loyal and LMS violated the same provision of the TSR, § 310.3(a)(2)(x), when their employees promised that the LI program would significantly and permanently lower customers' interest rates. Plaintiffs cite to an abundance of evidence that customers were promised credit cards with permanent zero percent interest rates. (PX 5 ¶¶ 5, 17; PX 8 ¶ 13; PX 10 ¶¶ 11-12; PX 13 ¶¶ 11-12; PX 21 ¶¶ 19-20; PX 23 ¶ 16; PX 24 ¶¶ 11, 14; PX 34 ¶ 23; PX 35 ¶ 15; PX 37 ¶¶ 12-13; PX 38 ¶ 10; PX 111 ¶ 10; PX 112 ¶ 7; PX 155 ¶ 7; see also Doc. 163-49 at 179:18-180:2 (noting that, as a salesperson, she would not inform customers that the zero-percent interest rate was introductory) ). But it is indisputable from the evidence that the zero-percent rates were not permanent. (See Wilhelm Decl., PX 42, ¶¶ 52, 98; Doc. 163-43 at 61:3-6, 95:5-8). Indeed, in his argument Guice only points to one individual who he argues obtained a permanent zero percent interest rate,[17] but the evidence he cites in *1269 support contradicts his contention. (Doc. 168 at 7 (claiming that "the company negotiated [Phyllis Burke's J.C. Penny card] down to zero percent permanently"); Phyliss Burke Business Records, Doc. 168-13, at 11 (noting under a "JCP" heading "0%, 48 mon[ths]") ).[18]
Guice also claims that these representations do not involve material aspects of the LI program because when the zero percent interest rate was set to expire, Loyal and LMS would obtain new introductory zero percent credit cards for the customers and transfer the customer's balance or would obtain a hardship status for the customer. Thus, according to Guice, for all intents and purposes, the customers did get a permanent zero percent interest rate. Guice's argument is without merit.
As discussed above, at the time these statements were made, the employees did not have sufficient information to determine whether the customers would have qualified for a promotional zero percent interest rate, much less whether they would be able to continuously qualify for one or otherwise obtain a hardship status.[19] Additionally, even assuming that the customers could qualify for such rates, these statements were still material misrepresentations because the customers did not know-and thus were not able to weigh-the fact that they would have to frequently open new credit cards and pay balance transfer fees or that they would have to close their credit card accounts due to hardship status. See also RCA Credit Servs. , 727 F.Supp.2d at 1329 (noting that express claims used to induce the purchase of services are presumed to be material (quoting Transnet Wireless Corp. , 506 F.Supp.2d at 1267 ) ). Further, customers were not warned that obtaining new credit cards or going into hardship status could impact their creditworthiness, which in and of itself supports the conclusion that these statements were material. 16 C.F.R. § 310.3(a)(2)(x) (including misrepresentations regarding "the effect of the service on a customer's creditworthiness" in the list of actionable misrepresentations about "material aspect[s] of [a] debt relief service"). Moreover, putting a customer's account into hardship status cannot satisfy the promise to obtain a permanent zero percent interest credit card for the customer. Going into hardship status closes the account and the customer can no longer use the card, and while hardship statuses typically last longer than an introductory zero percent credit card, they are not permanent.
Guice is liable for the misrepresentations regarding permanent zero-percent interest rates. The managers of Loyal and LMS knew that the salespeople were making such misrepresentations. (Doc. 163-49 at 177:24-178:19). When their knowledge is combined with Guice's involvement in the day-to-day operations of the common enterprise, his frequent contact with Loyal's and LMS's managers, and his invocation of his Fifth Amendment right in response to whether Loyal's and *1270 LMS's employees made such misrepresentations, (Doc. 163-43 at 60:19-61:6, 94:12-16, 94:25-95:8), it is sufficiently established that, at a minimum, Guice was aware of a high probability of fraud and, if he did not have actual knowledge, it was because he intentionally avoided the truth. Therefore, insofar as Counts One, Three, and Eleven involve misrepresentations regarding permanent, substantially lower interest rates, Plaintiffs are entitled to summary judgment.
e. Omissions Regarding Adverse Effects
As explained previously, Defendants' DE program exclusively relied on customers failing to make timely payments to creditors. In such circumstances, the TSR requires specific disclosures regarding adverse consequences, which Plaintiffs assert Loyal and LMS failed to make. If "any aspect of [a] debt relief service relies upon or results in the customer's failure to make timely payments to creditors or debt collectors," sellers and telemarketers must disclose-prior to the customer consenting to pay for the service-"that the use of the debt relief service will likely adversely affect the customer's creditworthiness, may result in the customer being subject to collections or sued by creditors or debt collectors, and may increase the amount of money the customer owes due to the accrual of fees and interest." 16 C.F.R. § 310.3(a)(1)(viii)(C).
Loyal and LMS employees did not disclose any of the possible negative consequences listed above. (See, e.g. , PX 2 ¶¶ 33-35; PX 3 ¶ 18-20; PX 6 ¶ 8; PX 16 ¶¶ 29-31; PX 20 ¶¶ 23-27; PX 25 ¶¶ 42-43; PX 28 ¶¶ 11, 22; PX 111 ¶¶ 33-36; PX 112 ¶¶ 25-27; Doc. 163-50 at 147:6-25; see also Doc. 163-43 at 64:2-18, 97:20-98:13 (pleading the Fifth) ). Guice argues that-despite the abundance of evidence indicating that customers were not warned that their credit would be adversely affected or that their accounts may be put into collections-the customers must have been told about that possibility because the "New Client Packet"-which was typically sent to customers months after starting the DE program-included an offer to assist clients with credit repair and dealing with collections. Such an argument is based purely on conjecture, is contradicted by the record evidence, and is without merit.[20]
Guice is liable for these violations. Guice was intimately involved in the DE program. He introduced the DE program into the company, (Doc. 163-52 at 24:24-25:6), and was involved in establishing details of the operation, including setting the DE negotiator's salaries and specifying their hiring qualifications, (id. at 99:9-11; Doc. 163-45 at 12:15-13:4). Once the program was up and running, Guice spoke with Kara Andrews, a manager of the DE program, (163-52 at 27:24-28:5, 28:19-21, 90:21-23), regularly-often daily-regarding all aspects of the DE program, including which client accounts were being completed, which were being negotiated, and any problems or complaints. (Id. at 99:24-101:9; see also Doc. 163-45 at 13:8-13).
*1271 Guice also gave Andrews instructions on how to deal with the problems and complaints regarding the DE program. (Doc. 163-52 at 101:10-12; see also Doc. 163-45 at 13:14-18). In addition, Guice spoke with Brownell, the primary salesperson for the DE program, on a weekly basis. (Doc. 163-50 at 163:24-164:3). When this evidence is combined with Guice's above-referenced invocation of his Fifth Amendment right against self-incrimination, there is no issue of fact: Guice is liable for the failure to make disclosures under § 310.3(a)(1)(viii)(C). Thus, Plaintiffs will be granted summary judgment as to Count Six.
f. Misrepresentations Regarding a Fund to Pay Off Debts
Additionally, with regard to the DE program, Loyal and LMS employees regularly led customers to believe that there was some sort of fund that could be used to pay off their debt-sometimes it was referred to as a government fund and other times it was described as a fund created by a lawsuit against the credit card companies. (PX 2 ¶ 31; PX 3 ¶ 16; PX 6 ¶ 6; PX 7 ¶ 26; PX 9 ¶ 8; PX 10 ¶ 37; PX 16 ¶ 24; PX 20 ¶ 16; PX 25 ¶ 38; PX 28 ¶ 5; PX 30 ¶ 16; PX 31 ¶ 8; PX 36 ¶ 18; PX 38 ¶ 24; PX 111 ¶ 27; PX 112 ¶ 5; see also Doc. 163-50 at 209:17-210:8, 210:24-16; PX 197 at 141:2-17; Doc. 163-43 at 62:3-18, 96:3-13 (pleading the Fifth). Such statements were false; no such fund existed. (See Doc. 163-50 at 210:24-211:16; Doc. 163-51 at 149:23-150:3). Thus, these statements violated Section 5, FDUTPA, and § 310.3(a)(2)(x) of the TSR.
Guice is liable for these violations. In addition to the analysis of Guice's involvement in the DE program discussed in Section III.C.2.e above, there is evidence that Cline-a manager who spoke to Guice on a regular basis regarding Loyal's and LMS's operations-had actual knowledge of the false statements regarding a government fund. (Ex. 6 to Maxwell Decl., PX 28, at 43). This evidence combined with Guice's intimate involvement in the DE program and his invocation of his Fifth Amendment right against self-incrimination is sufficient to establish Guice's knowledge of these violations. Thus, Plaintiffs will be granted summary judgment as to Counts Six and Seven and as to Counts One, Three, and Eleven insofar as they relate to misrepresentations regarding the government fund.
3. Up-Front Fees
Finally, Plaintiffs assert that Defendants requested and collected fees from customers prior to providing any services, in violation of the TSR. Sellers and telemarketers are prohibited from "[r]equesting or receiving payment of any fee or consideration for any debt relief service until and unless ... (A) [t]he seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt ...; [and] (B) [t]he customer has made at least one payment pursuant to [the new terms obtained for the customer]." 16 C.F.R. § 310.4(a)(5)(i). With regard to the DE program, it is undisputed that Defendants requested that customers pay fees prior to providing any services, and often Defendants actually collected such payment prior to doing so. (Doc. 163-50 at 153:24-154:7; PX 2 ¶¶ 32, 37-38; PX 3 ¶¶ 21-23; PX 6 ¶¶ 6, 9; PX 7 ¶¶ 27-28, 31-35; PX 9 ¶¶ 4-7; PX 10 ¶¶ 38-40, 45-49; PX 16 ¶¶ 26-28; PX 18 ¶¶ 38, 45-52; PX 20 ¶¶ 18-22, 29-30; PX 25 ¶¶ 39-41, 46-53; PX 26 ¶¶ 29, 38-42; PX 27 ¶¶ 10, 13, 20-22; PX 28 ¶¶ 15-16, 28; PX 30 ¶ 31, 33-35; PX 31 ¶ 8; PX 36 ¶¶ 19, 21-22; PX 38 ¶¶ 26-28, 32; PX 111 ¶¶ 29-32, 37-39; see also Doc. 163-43 at 65:25-66:6 (pleading the Fifth); Doc. 168 at 8-9 (making arguments only as to the LI program) ).
*1272 As to the LI program, the evidence also supports that Loyal and LMS employees, at a minimum, requested payment from customers prior to the customer making at least one payment on a lower interest rate card. (PX 2 ¶¶ 15, 20-25; PX 3 ¶¶ 5-10; PX 4 ¶¶ 16, 19, 23, 25-26; PX 5 ¶¶ 10, 12-16; PX 7 ¶¶ 10-11, 14-20; PX 8 ¶¶ 9, 16-19, 25; PX 10 ¶¶ 14, 17-19, 22-27, 29-30; PX 12 ¶¶ 17, 24-31, 35; PX 13 ¶¶ 8, 10-12, 15-16, 20, 24-26; PX 15 ¶¶ 14, 18-21; PX 16 ¶¶ 12, 14-20; PX 17 ¶¶ 15-16, 20-21, 25-27; PX 18 ¶¶ 16-18, 26-28, 31-34; PX 19 ¶¶ 22, 47-50, 55-56, 63-64, 78-79; PX 20 ¶¶ 9-14; PX 21 ¶¶ 30-32, 35-39; PX 22 ¶¶ 9-16; PX 23 ¶¶ 10-12, 26-33, 35-37; PX 24 ¶¶ 15, 17-28; PX 25 ¶¶ 12, 22-31; PX 26 ¶¶ 13, 17-21; PX 33 ¶¶ 20, 24-28; PX 34 ¶¶ 28-31, 43; PX 35 ¶¶ 25, 30-35; PX 36 ¶¶ 9-16; PX 37 ¶¶ 15-16, 22, 24-32; PX 38 ¶¶ 11, 17-19, 22; PX 111 ¶¶ 11, 16-21). Guice argues that because in many cases new credit cards had been obtained when fees were requested or charged, Defendants complied with the law. This argument fails. The TSR requires that customer make at least one payment pursuant to the new terms prior to payment being requested. As the above-referenced consumer declarations make clear, most of the time when payment was requested-and often when payment was actually made-no debt had even been transferred to the new card. More importantly, there is no evidence on the record that Defendants ever waited until after payment on the new card had been made to request payment.
Further, Guice is liable for these violations because he was given actual notice of the up-front fees via customer complaints. (Doc. 163-15 at 1, 8 (stating in a complaint to Pennsylvania Attorney General's Office, which was e-mailed to Guice, that on the day the customer signed up for the LI program she was charged $2,500 for the services), 13-14 (stating in a complaint to the Illinois Attorney General's Office, which was e-mailed to Guice, that an employee directed the customer to obtained a cash advance and pay the fee prior to receiving a lower interest rate card), 23 (stating in a complaint to the Illinois Attorney General's Office, which was e-mailed to Guice, that she was required to pay a $500 up-front fee for the LI program) ). Additionally, as explained in Section III.B.1, Guice controlled the flow of money in and out of the Shell Defendants-to which these customer payments were made. Finally, as indicated by the above-cited consumer declarations, the process by which payment was requested was standardized. Given Guice's involvement in developing the policies and procedures of the Defendant companies, as discussed at length throughout this Order, it is impossible to conclude anything other than the fact that Guice had knowledge of these violations. (See also Doc. 163-43 at 65:17-66:6, 99:9-23 (pleading the Fifth) ). Therefore, Plaintiffs will be granted summary judgment as to Count Seven.
IV. RELIEF
Having determined that Guice is liable for each of the Counts asserted against him, the Court will now turn to the appropriate relief. Plaintiffs seek both injunctive and equitable monetary relief from Guice. Each will be discussed in turn.
A. Injunctive Relief
Plaintiffs seek a permanent injunction, enjoining Guice from engaging in any type of telemarketing and prohibiting him from advertising, marketing, or selling any debt-relief product or service. The FTC Act and FDUTPA permit the Court to enter such an injunction under appropriate circumstances. 15 U.S.C. § 53(b) ; Fla. Stat. § 501.207(1)(b). To determine whether a permanent injunction is appropriate, "the test is whether the defendant's past conduct indicates that there is a reasonable *1273 likelihood of further violations in the future." Lalonde , 545 F. App'x at 841 (quotation omitted); F.T.C. v. NPB Advert., Inc. , 218 F.Supp.3d 1352, 1365 (M.D. Fla. 2016) (noting that a permanent injunction "is warranted if the FTC demonstrates a cognizable danger that the defendant will violate the law again" (citing United States v. T. Grant Co. , 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) ) ).
Plaintiffs have established that there is a reasonable likelihood that Guice will engage in future violations. Guice has formed multiple corporate entities to facilitate and attempt to conceal his violations, he has continuously denied any wrongdoing, and his "violations were egregious and recurrent over several years, despite numerous consumer complaints, as well as investigations and inquiries by state authorities." F.T.C. v. Lanier Law, LLC , 194 F.Supp.3d 1238, 1289 (M.D. Fla. 2016) ; see also F.T.C. v. USA Fin., LLC , 415 F. App'x 970, 975 (11th Cir. 2011) (concluding that "[t]he defendants' formation of new corporate entities to facilitate their violations of the FTCA and TSR demonstrates an unwillingness to comply with the law"); Partners in Health Care Ass'n , 189 F.Supp.3d at 1370 (finding "[o]f particular concern" the defendant's "continued denial that he did anything wrong despite the fact that he received customer complaints about the violations ... [but] he did not take steps necessary to halt the misrepresentations in a four-year span"). Additionally, the barriers to entry in the debt-relief and telemarketing industries are low. F.T.C. v. Washington Data Res. , 856 F.Supp.2d 1247, 1282 (M.D. Fla. 2012), aff'd , 704 F.3d 1323 (11th Cir. 2013) (considering the low "economic barriers to enter" a certain industry when enjoining the defendants from participating in that industry in the future).
Moreover, the fact that future violations could result in significant harm to consumers weighs in favor of issuing a permanent injunction. F.T.C. v. Glob. Mktg. Grp., Inc. , 594 F.Supp.2d 1281, 1290 (M.D. Fla. 2008) ("A permanent injunction restraining a defendant from engaging, directly or indirectly, in any and all future involvement with telemarketing operations is an appropriate remedy if it would protect the public from potential future violations by the defendant." (quotation omitted) ); see also Washington Data Res. , 856 F.Supp.2d at 1282 (approving the issuance of a permanent injunction and considering the potential harm to consumers that would be caused by future violations). Accordingly, Plaintiffs have established that they are entitled to the requested permanent injunction.
B. Monetary Relief
In addition to injunctive relief, Plaintiffs may seek "payment of consumer redress" in the form of restitution and disgorgement of unlawfully obtained funds. McGregor v. Chierico , 206 F.3d 1378, 1387 (11th Cir. 2000) ; Gem Merch. Corp. , 87 F.3d at 469-70 ; FTC v. U.S. Oil & Gas Corp. , 748 F.2d 1431, 1434 (11th Cir. 1984). To establish an entitlement to restitution, Plaintiffs must show injury to the consumers, but they are not required to show actual reliance by each individual consumer. McGregor , 206 F.3d at 1388. "A presumption of actual reliance arises once the [Plaintiffs have] proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." Id. (quotation omitted).
For the reasons discussed above, Plaintiffs have established that Defendants made-and Guice is liable for-material misrepresentations that were widely disseminated. It is undisputed that consumers *1274 purchased Defendants' products. Thus, Plaintiffs are entitled to restitution on behalf of the consumers.
The proper amount of restitution is "the amount of net revenue (gross receipts minus refunds)." F.T.C. v. Washington Data Res., Inc. , 704 F.3d 1323, 1326-27 (11th Cir. 2013). To establish the amount of restitution due, Plaintiffs "must show that its calculations reasonably approximated the amount of customers' net losses," but "[t]he calculation may be properly based on estimates." RCA Credit Servs., LLC , 727 F.Supp.2d at 1336-37. Once Plaintiffs have sufficiently calculated the amount of restitution, "the burden shifts to the defendants to show that those figures [are] inaccurate." Id.
Plaintiffs submitted the affidavit of Emil T. George, a forensic accountant. (Second George Decl., Doc. 163-18, ¶ 1). Mr. George calculated restitution based on two Microsoft Excel spreadsheets obtained from Defendants' office, which were created by Defendants to track their customers' payments. (Id. ¶ 4; see also Doc. 175-1 at 149:24-150:15). As part of his calculations, Mr. George took steps to remove customers who had not paid and to avoid double-counting consumers. (Doc. 163-18 ¶¶ 7-11, 15). And after he completed his calculations, Mr. George conducted spot checks on a sample of customers to ensure accuracy. (Id. ¶¶ 13, 16). Mr. George's analysis is sufficient to reasonably approximate the amount of the customer's net losses, and Guice has not presented any evidence to rebut the accuracy of his calculations. Thus, Plaintiffs have established an entitlement to $23,099,878.02[21] in restitution. (Id. ¶¶ 12, 15).
V. CONCLUSION
In accordance with the foregoing, it is ORDERED and ADJUDGED as follows:
1. Plaintiffs' Dispositive Motion for Summary Judgment (Doc. 163) is GRANTED.
2. The Clerk is directed to enter judgment in favor of Plaintiffs and against Defendant Kevin Guice in the amount of $23,099,878.02. Thereafter, the Clerk shall close this case.
3. The Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.
It is FURTHER ORDERED as follows:
A. Definitions
1. For purposes of this Order, the following definitions apply:
a. "Clearly and Conspicuously" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:
i. In any communication that is solely visual or solely audible, the disclosure shall be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure shall be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.
ii. A visual disclosure, by its size, contrast, location, the length of *1275 time it appears, and other characteristics, shall stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.
iii. An audible disclosure, including by telephone or streaming video, shall be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.
iv. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure shall be unavoidable.
v. The disclosure shall use diction and syntax understandable to ordinary consumers and shall appear in each language in which the representation that requires the disclosure appears.
vi. The disclosure shall comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.
vii. The disclosure shall not be contradicted or mitigated by, or inconsistent with, anything else in the communication.
viii. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.
b. "Corporate Defendants" means Life Management Services of Orange County, LLC; Loyal Financial & Credit Services, LLC, also d/b/a FOC Credit and Reward Services; IVD Recovery, LLC; KWP Services, LLC; KWP Services of Florida LLC; LPSOFFLA LLC; LPSOFFLORIDA L.L.C.; PW & F Consultants of Florida LLC; UAD Secure Services LLC; UAD Secure Service of FL LLC; URB Management, LLC; YCC Solutions LLC; YFP Solutions LLC, and their successors and assigns, as well as any subsidiaries, and any fictitious business entities or business names created or used by these entities.
c. "Debt-Relief Product or Service" means any product, service, plan, or program represented, expressly or by implication, to:
i. renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a Person and one or more creditor or debt collector, including, but not limited to, a reduction in balance, interest rate, or fees owed by a Person to any creditor or debt collector;
ii. improve, repair, or arrange to improve or repair, any consumer's credit record, credit history, or credit rating;
iii. provide, arrange, or assist any consumer in receiving, credit cards, debit cards, or stored-value cards; or
iv. stop, prevent, or postpone any mortgage or deed-of-foreclosure sale for a person's dwelling, any other sale of collateral, any repossession of a person's dwelling or other collateral, or otherwise save a person's dwelling or other collateral from foreclosure or repossession.
d. "Defendants" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.
e. "Financial Institution" means any bank, savings and loan institution, credit union, or any financial depository *1276 of any kind, including any brokerage house, trustee, broker-dealer, escrow agent, title company, commodity trading company, or precious metal dealer.
f. "Kevin Guice's Personal Property" means the following personal property listed in Federal Trade Commission's Financial Statement of Individual Defendants ("Kevin Guice Financial Statement") completed by Defendant Kevin Guice as required by Section VII of the Temporary Restraining Order: 2013 Porsche Panamera; 2014 Infinity QX80; Two 2014 Yamaha Jet skis (Model No. FXSVHO); Jet Ski trailer; Breitling Mercury 7 Aurora watch; Breitling Transocean watch; Breguet White Gold watch; Cartier Balloon Blue watch; Two Hublot Classic Fusion watches; Hublot Classic Fusion Ultra Thin watch; Hublot Classic Fusion 38 Rose Gold watch; Hublot King Power watch; Mont Blanc Nicholas Rieussec watch; Mont Blanc UTC watch; Omega Moonphase watch; Omega Seamaster Steel Aqua Terra watch; Omega Seamaster Steel Rose Gold watch; TAG Heuer 300 Carrera Jack Heuer Edition watch; TAG Heuer 300 sir watch; TAG Heuer Carrera Calibre, 1887 Chronograph watch; TAG Heuer Link watch; TAG Heuer Smart Watch; Remington Model 700, Rifle, Serial No. 67031709; and Weatherby, Inc. Rifle, Serial No. VB010830.
g. "Individual Defendants" means Kevin W. Guice; Chase P. Jackowski; Linda N. McNealy a/k/a Linda N. Parker; Clarence H. Wahl a/k/a Harry Wahl; Karen M. Wahl, and by whatever other names each may be known.
h. "Person" means a natural person, organization, or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.
i. "Plaintiffs" means the Federal Trade Commission ("FTC" or "Commission") and Office of the Attorney General, State of Florida, Department of Legal Affairs ("State of Florida").
j. "Telemarketing" means any plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the Telemarketing Sales Rule.
B. Permanent Injunction
1. Defendant Kevin Guice is permanently restrained and enjoined from participating in Telemarketing, whether directly or through an intermediary.
2. Defendant Kevin Guice is permanently restrained and enjoined from advertising, marketing, promoting, offering for sale, selling, or assisting others in the advertising, marketing, promoting, offering for sale, or selling, any Debt-Relief Product or Service.
3. Defendant Kevin Guice, his agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product, service, plan, or program are permanently restrained and enjoined from:
*1277 a. Misrepresenting, or assisting others in misrepresenting, expressly or by implication:
i. The total cost to purchase, receive, or use any product, service, plan, or program;
ii. That any person is affiliated with, endorsed or approved by, or otherwise connected to any other person; government entity; public, non-profit, or other non-commercial program; or any other program;
iii. The expertise, position, or job title of any person who provides any product, service, plan, or program;
iv. The terms of any policy about refunds, cancellations, exchanges, or re-purchases;
v. Any material aspect of the performance, efficacy, nature, or characteristics of any product, service, plan, or program; or
vi. Any other material fact.
b. Failing to disclose, or assisting others in failing to disclose, Clearly and Conspicuously:
i. The total cost to purchase, receive or use any product, service, plan, or program;
ii. The terms of any policy about refunds, cancellations, exchanges, or re-purchases; or
iii. Any material aspect of the performance, efficacy, nature, or characteristics of any product, service, plan, or program.
4. Defendant Kevin Guice, his agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product or service, are permanently restrained and enjoined from:
a. Obtaining payment by taking a cash advance against a consumer's credit card; and
b. Causing billing information to be submitted for payment without first having obtained consumer's express written consent to submit such billing information for payment.
C. Equitable Monetary Relief
1. All payments under this Order shall be made by electronic fund transfer in accordance with instructions previously provided by a representative of the Plaintiffs.
2. In partial satisfaction of the Judgment in this case, the following assets shall be transferred to the Commission as follows:
a. The Receiver is authorized to promptly take possession of and liquidate Defendant Kevin Guice's Personal Property without further order of this Court and transfer the proceeds of the liquidation to the Commission, less any amount deducted pursuant to Subsection V.C.2.c below. Defendant Kevin Guice shall take all steps necessary to assist the Commission and the Receiver to take possession of and liquidate such property, including signing any documents necessary to transfer ownership. In the event that it is necessary for Defendant Kevin Guice to execute documents to facilitate the liquidation of such property, he shall execute and return such documents within three days of a request by any Plaintiff or the Receiver.
b. The Receiver is ordered to transfer to the Commission any funds held in the name of Defendant Kevin Guice that were transferred to the Receiver, *1278 less any amount deducted pursuant to Subsection V.C.2.c below. This includes proceeds from the Court-approved sale of "Tuff Life II," a 55' Ocean Yacht that belonged to Defendant Kevin Guice (See generally Order, Doc. 108). This also includes funds previously held in (1) USAA Federal Savings Bank account number xx1315 in the name of Kevin W. Guice and Shannon W. Guice; (2) USAA Federal Savings Bank account number xx1323 in the name of Kevin W. Guice and Shannon W. Guice; (3) Trustco Bank account number xx3159 in the name of Kevin W. Guice; and (4) Central Florida Educators Federal Credit Union account number xx8952 in the name of Kevin W. Guice and John Scott Samples.
c. The Receiver and all personnel hired by the Receiver, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties prescribed by Subsections V.C.2.a-b above from the assets that are the subject of those Subsections. The Receiver shall apply to the Court for approval of specific amounts of compensation and expenses and must not increase the hourly rate used as the bases for such fee applications without prior approval of the Court.
3. Defendant Kevin Guice relinquishes all rights and claims he has to any asset currently in the possession, custody, or control of the Receiver, including, but not limited to, all funds transferred to the Receiver from any bank accounts held in the name of any Defendant, proceeds from the court-approved sale of Defendant Kevin Guice's yacht, and proceeds from the sale of any property transferred to the Receiver pursuant to a settlement with any Defendant.
4. Defendant Kevin Guice relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.
5. Defendant Kevin Guice's Taxpayer Identification Number or Social Security Number, which were previously submitted to the Plaintiffs, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.
6. This Order is the result of a government agency action on behalf of injured purchasers of Defendants' Debt-Relief Product or Service and may serve as the basis to recover any surety bond, letter of credit, certificate of deposit, or other form of security filed with the Florida Department of Agriculture and Consumer Services ("FDACS"). Restitution may be paid from any such surety bond, letter of credit, certificate of deposit, or other form of security filed with the FDACS.
7. All money paid to the Plaintiffs pursuant to this Order may be deposited into a fund administered by the Commission or its designee on behalf of both the Commission and the State of Florida. This fund shall be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund. If a representative of any Plaintiff decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Plaintiffs may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to the Defendants' practices alleged in the Complaint. Any money not used for such *1279 equitable relief shall be divided between the Commission and the State of Florida to be deposited to the U.S. Treasury as disgorgement and the State of Florida Department of Legal Affairs Revolving Trust Fund for costs, fees, and future enforcement. Defendants in this proceeding have no right to challenge any actions the Plaintiffs, the Receiver, or their representatives may take pursuant to this Subsection.
D. Modification of Asset Freeze
1. The freeze on Defendant Kevin Guice's assets pursuant to the Preliminary Injunction Order is hereby modified to permit the payments and transfers identified in Section V.C of this Order. After Defendant Kevin Guice has paid the entire judgment amount entered in this case, the asset freeze is dissolved as to Defendant Kevin Guice. A Financial Institution shall be entitled to rely upon a letter from any Plaintiff that the freeze on Defendant Guice's assets has been lifted.
E. Customer Information
1. Defendant Guice, his agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from directly or indirectly:
a. Failing to provide sufficient customer information to enable Plaintiffs to efficiently administer consumer redress. If a representative of any Plaintiff requests in writing any information related to redress, Defendant Kevin Guice shall provide it, in the form prescribed by the Commission, within fourteen days;
b. Disclosing, using, or benefiting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order; and
c. Failing to destroy such customer information in all forms in their possession, custody, or control within thirty days after receipt of written direction to do so from a representative of any Plaintiff.
2. Provided, however, that customer information need not be destroyed, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.
F. Prohibition Against Collecting on Accounts
1. Defendant Kevin Guice, his agents, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from attempting to collect, collecting, or assigning any right to collect payment from any consumer who purchased or agreed to purchase any Debt-Relief Product or Service from any Defendant.
G. Cooperation
1. Defendant Kevin Guice shall fully cooperate with representatives of the Plaintiffs and the Receiver in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint. Defendant Kevin Guice shall provide truthful and complete information, *1280 evidence, and testimony. Defendant Kevin Guice shall appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission or State of Florida representative may reasonably request upon five days written notice, or other reasonable notice, at such places and times as a Commission or State of Florida representative may designate, without the service of a subpoena.
H. Order Acknowledgements
1. Defendant Kevin Guice shall obtain acknowledgments of receipt of this Order as follows:
a. Defendant Kevin Guice, within seven days of entry of this Order, shall submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.
b. For twenty years after entry of this Order, for any business that Defendant Kevin Guice, individually or collectively with any other Defendant, is the majority owner or controls directly or indirectly, Defendant Kevin Guice shall deliver a copy of this Order to:
i. All principals, officers, directors, and LLC managers and members;
ii. All employees, agents, representatives, payment processors, and list brokers, who participate in conduct related to the subject matter of this Order; and
iii. Any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.
Delivery shall occur within seven days of entry of this Order for current personnel. For all others, delivery shall occur before they assume their responsibilities.
2. For twenty years after entry of this Order, in any other business, such as one in which Defendant Kevin Guice is an employee without any ownership or control, Defendant Kevin Guice shall deliver a copy of this Order to all principals and managers of the business before participating in conduct related to the subject matter of this Order.
3. From each individual or entity to which Defendant Kevin Guice delivered a copy of this Order, Defendant Kevin Guice shall obtain, within thirty days, a signed and dated acknowledgment of receipt of this Order.
I. Compliance Reporting
4. Defendant Kevin Guice shall make timely submissions to the Plaintiffs as follows:
a. One year after entry of this Order, Defendant Kevin Guice shall submit a compliance report, sworn under penalty of perjury.
b. In the compliance report, Defendant Kevin Guice shall:
i. Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of any Plaintiff may use to communicate with Defendant Kevin Guice;
ii. Identify all of Defendant Kevin Guice's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;
iii. Describe the activities of each business, including the products and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Defendant Kevin Guice shall describe if *1281 he knows or should know due to his own involvement);
iv. Describe in detail whether and how Defendant Kevin Guice is in compliance with each Section of this Order;
v. Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Plaintiffs;
vi. Identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences associated with Defendant Kevin Guice;
vii. Identify all business activities, including any business for which Defendant Kevin Guice performs services whether as an employee or otherwise and any entity in which Defendant Kevin Guice has any ownership interest; and
viii. Describe in detail Defendant Kevin Guice's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.
5. For twenty years after entry of this Order, Defendant Kevin Guice shall submit a compliance notice, sworn under penalty of perjury, within fourteen days of any change in the following:
a. Any designated point of contact;
b. The structure of any Corporate Defendant or any entity that Defendant Kevin Guice has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order;
c. Name, including aliases or fictitious name, or residence address; or
d. Title or role in any business activity, including any business for which Defendant Kevin Guice performs services whether as an employee or otherwise and any entity in which Defendant Kevin Guice has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.
6. Defendant Kevin Guice shall submit to the Plaintiffs notice of the filing of any bankruptcy petition, insolvency proceeding, or any similar proceeding by or against Defendant within fourteen days of its filing.
7. Any submission to the Plaintiffs required by this Order to be sworn under penalty of perjury shall be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:" and supplying the date, signatory's full name, title (if applicable), and signature.
8. Unless otherwise directed by a representative of any Plaintiff in writing, all submissions to the Commission pursuant to this Order shall be emailed with the subject line beginning, FTC v. Kevin W. Guice, et. al. , No. 6:16-cv-982-Orl-41TBS to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to both:
Associate Director for EnforcementBureau of Consumer ProtectionFederal Trade Commission600 Pennsylvania Avenue NWWashington, DC 20580
and
Assistant Attorney GeneralOffice of the Attorney General *1282 Consumer Protection Division135 West Central Blvd., Suite 670Orlando, Florida 32801
J. Recordkeeping
1. Defendant Kevin Guice shall create certain records for twenty years after entry of this Order and retain each such records for five years. Specifically, Defendant Kevin Guice for any business that he, individually or collectively with any other Defendant, is a majority owner or controls directly or indirectly, shall create and retain the following records:
a. Accounting records showing the revenues from all products or services sold;
b. Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;
c. Records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;
d. Customer files showing the names, addresses, telephone numbers, dollar amounts paid, and the quantity and description of products or services purchased, to the extent such information is obtained in the ordinary course of business;
e. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission;
f. A copy of each unique advertisement or other marketing material; and
g. Copies of contracts with, or all documents relating to any sale of any product or service involving, payment processors, list brokers, lead generators, dialers, or dialing platforms.
K. Compliance Monitoring
2. For the purpose of monitoring compliance with this Order, Defendant Kevin Guice shall comply with the following:
a. Within fourteen days of receipt of a written request from a representative of any Plaintiff, Defendant Kevin Guice shall: submit additional compliance reports or other requested information, which shall be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. Plaintiffs are also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.
b. For matters concerning this Order, the Plaintiffs are authorized to communicate directly with Defendant Kevin Guice. Defendant Kevin Guice shall permit representatives of any Plaintiff to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.
c. Plaintiffs may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, Defendant Kevin Guice or any individual or entity affiliated with Defendant Kevin Guice, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.
*1283 d. Upon written request from a representative of any Plaintiff, any consumer reporting agency shall furnish consumer reports concerning Defendant Kevin Guice, pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1).
DONE and ORDERED in Orlando, Florida on December 7, 2018.

Plaintiffs filed a large number of exhibits on a CD with the Clerk's office. These documents are not currently on the electronic docket and are, therefore, referred to by the exhibit number listed on the CD.

Evidence establishing that Loyal, LMS, and the Shell Defendants were interrelated companies is discussed below in Section III.A.

The TSR contains regulations implementing the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 -6108. 16 C.F.R. § 310.1.

Eventually, Brezinski no longer wanted to be employed by LMS; Norris informed Guice of this, and Brezinski was replaced by Harry Wahl on the paperwork. (Doc. 163-44 at 258:24-259:15; see also Doc. 163-43 at 88:18-21 (pleading the Fifth as to whether Wahl replaced Brezinski at Guice's direction) ).

It appears to be undisputed that Guice owned and operated Loyal, but a more thorough discussion of the evidence supporting his ownership is set forth in Section III.B.1.

Indeed, some of the declarations submitted by Guice state that several employees were employed by LMS prior to February 3, 2014, which was the date LMS was first established. (PX 47 at 13; Dold Aff., Doc. 168-3, at 1; Lenon Aff., Doc. 168-4, at 1; O'Donnell Aff., Doc. 168-5, at 1). These individuals were listed as employees of Loyal on Loyal's filings. (See PX 43 at 96 (indicating that a "Copy of Employee Information" was attached to Loyal's FDACS Application); id. at 98-99 (providing employee information, including information for Dold and O'Donnell); id. at 118 (listing Lenon as a salesperson for Loyal in its FDACS Application) ).

Further, at least one LMS employee testified that he was instructed by management not to tell customers that he worked for LMS-he was required to always use the name of one of the Shell Defendants. (163-51 at 49:24-50:2; see also C. Cherry Decl., PX 11, ¶ 11 ("[The LMS employee] added that he was not supposed to tell people that he worked for [LMS] and that he would probably be fired for providing that information"). But see Second Andrews Dep., Doc. 175-1, at 149:15-18 (indicating that Andrews never forbid employees from saying that they worked for LMS) ).

One of the Shell Defendants was only used to shuffle money between the various Defendants. (Doc. 163-44 at 254:22-255:17).

As payment for their services, these individuals were entitled to keep a percentage of the money they transferred. (Doc. 163-47 at 15:15-20; Doc. 163:44 at 234:17-235:2).

Most of the Shell Defendants listed residential addresses as their principal office location. (See PX 47 ¶¶ 13-24).

"[I]n a civil suit such as this one, the court may draw adverse inferences against a party that invokes the Fifth Amendment." Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc. , 561 F.3d 1298, 1304 (11th Cir. 2009). Moreover, as noted in the analysis, there is ample evidence aside from Guice's silence to support summary judgment in favor of Plaintiffs-Guice's invocation of his Fifth Amendment right is cited as additional supporting evidence. See Baxter v. Palmigiano , 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.").

Salespeople are referred to as "closers" by some of the witnesses.

Similarly, whether Guice was physically present at LMS's offices is inconsequential where the abundance of evidence indicates that he asserted control via phone and e-mail.

Further, the evidence indicates that once customers verbally consented to purchasing the LI program, Loyal and LMS would not permit customers to change their minds. (See, e.g. , PX 17 ¶ 24 (threatening to sue a customer because she decided she no longer wanted to purchase the LI program); (PX 21 ¶ 23-24 (telling a customer that they "had a binding contract" when the customer was hesitant to continue with the LI program); PX 22 ¶ 25 (refusing to refund a customer's money and claiming that they "had a binding contract"); PX 23 ¶ 42 (threatening to have a customer arrested, to refer her to collections, and to freeze the customer's personal checking account if the customer did not pay the fees for the LI program) ).

Plaintiffs assert that consumers were promised that they would realize these savings in a short period of time, but most were not given a timeframe within which those savings would occur. (See e.g. , PX 18 ¶ 25; PX 20 ¶ 8-9; PX 22 ¶ 8; PX 23 ¶ 13; PX 33 ¶ 16. But see PX 2 ¶¶ 11, 18 (promising that the customer would save thousands in a short period of time); PX 3 ¶ 5 (same) ).

Guice spends much of his response asserting that Loyal and LMS had many happy customers. The mere fact that there were some satisfied customers is inconsequential. Partners in Health Care Ass'n , 189 F.Supp.3d at 1367 (collecting cases). Further, Plaintiffs submitted declarations of individuals who were identified by Guice as examples of satisfied customers who benefitted from the LI or DE programs. However, those individuals stated that they were not satisfied, that they did not benefit, that their interest rates are now higher, that they did not save money, that their debt increased, and/or that their creditworthiness was significantly damaged. (Burns Decl., Doc. 175-2, ¶¶ 2-9, 12-13; Blyshak Decl., Doc. 175-3, ¶¶ 2-9, 13-14; Massar Decl., Doc. 175-4, ¶¶ 5-10, 13-14); Belyeu Decl., Doc. 175-5, ¶¶ 2-6, 11-16, 18-19; Martin Decl., Doc. 175-6, ¶¶ 2-11, 13-14; Martin Decl., Doc. 175-7, ¶¶ 2-5, 10-11).

Guice claims that "[t]he majority of consumers who entered the lower interest rate program received a permanent lower interest rate credit-card." (Doc. 168 at 6). Tellingly, Guice cites no evidence in support of this proposition.

Notably, Guice does not provide a pinpoint citation to support his contention that Ms. Burke received a permanent zero percent interest rate. Instead, he cites generally to a seventeen-page document filled with scribbled, at times unreadable, notes. Additionally, Guice does not specify whether Ms. Burke's interest rate was due to obtaining a hardship status.

Additionally, obtaining a hardship status would not fulfill the promise of a permanent zero percent interest rate credit card because going into hardship status closes the account and the customers would no longer be able to use the card.

To the extent Guice claims Andrews testified that customers were warned of the possibility that their credit score could go down during the debt elimination process, the cited portion of Andrews' deposition is not on the record. (Compare Doc. 168 at 13 nn. 46-47 (citing page 186 of Andrews' deposition) with Doc. 163-52 at ECF page 23-24 (skipping from deposition page 164 to deposition page 205) ). Regardless, Guice does not assert that such disclosures were made prior to the customer consenting to pay for the service as required by the TSR, nor does Guice assert that Andrews disclosed the other negative consequences required by the TSR. Moreover, Andrews was a manager; she was not the one selling the products to the customers and making-or not making-the required disclosures.

$11,434,434.50 for the LI program, (Doc. 163-18 ¶ 12), and $11,665,443.52 for the DE program, (id. ¶ 15).